UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| RICHARD ABRAHAMSON, M.D., *et al.*, | Case No. 1:16-cv-712 |
| Plaintiffs, | Judge Timothy S. Black |
| vs. | |
| BRIAN D. JONES, *et al.*, | |
| Defendants. | |

**ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS
FOR TEMPORARY RESTRAINING ORDER**

This civil action is before the Court on Plaintiffs' motion for temporary restraining order (Doc. 2), which was filed on June 29, 2016, and Plaintiffs' supplemental motion for temporary restraining order (Doc. 6), which was filed on July 1, 2016.[1]  On July 5, 2016, the Court held a hearing by telephone with respect to these motions.  Defendants did not participate.[2]

---

[1] In this latter motion, Plaintiffs clarify the relief sought in their original motion.  (Doc. 6).

[2] In a prior Order, the Court denied Plaintiffs' request for *ex parte* relief and scheduled the July 5, 2016 hearing.  (Doc. 5).  The Court ordered Plaintiffs to notify Defendants of the hearing by providing a copy of the Court's Order to Defendants via e-mail.  (*Id.* at 5).  Plaintiffs' counsel sent copies of the summons, complaint, and motion for temporary restraining order by certified and regular U.S. mail to what is believed to be Defendants' address, and the USPS website indicated that certified mail delivery was successfully made on all three Defendants on July 2, 2016.  (Doc. 7 at ¶¶ 3–4).  Additionally, on July 2, 2016, Dr. Abrahamson sent a text message to Defendant Jones at a number he and Defendant Jones had frequently used to communicate, advising him of the hearing.  (*Id.* at ¶ 5).  Finally, on July 2, 2016, Plaintiffs' counsel sent an e-mail to Defendant Jones at an address he and Dr. Abrahamson had used to communicate, advising him of the hearing and providing him with a copy of the Court's Order scheduling the hearing.  (*Id.* at ¶ 6; Doc. 7-1).

On June 6, 2016, Plaintiffs submitted additional evidentiary support for their motion. (Docs. 7, 8). On July 15, 2016, at Plaintiffs' request, the Court held a brief evidentiary hearing. Defendants did not participate.[3] During the evidentiary hearing, Plaintiffs elicited testimony from Timothy Spurlock, a Special Investigator with the Corporate Investigations Team at Fifth Third Bank. Plaintiffs' motions for temporary restraining order (Docs. 2, 6) are now ripe for the Court's review.

## I.  BACKGROUND FACTS

Plaintiffs Dr. Richard Abrahamson and Melinda Abrahamson seek a temporary restraining order and a preliminary injunction against Defendants Brian D. Jones, Brian Jones Farms, and Nathanial & Riggs Livestock, LLC. (Doc. 2). Plaintiffs claim that Defendant Jones defrauded them through a series of misrepresentations, resulting in a loss in excess of $500,000. (*Id.*)[4]

In October 2015, Mrs. Abrahamson came into contact with Defendant Jones via Doug Beech, one of Mrs. Abrahamson's business acquaintances. (Doc. 1 at ¶ 9).[5]

---

[3] On July 12, 2016, the Court ordered Plaintiffs to notify Defendants of the upcoming hearing via e-mail, forthwith. (See July 12, 2016 Notation Order). Additionally, the Clerk provided notice of the hearing to Defendants via ordinary mail. (*Id.*)

[4] Plaintiffs allege, without citation, that at various times throughout Plaintiffs' dealings with Defendant Jones, he represented that he operated under the names "Brian Jones Farms" and "Nathanial & Riggs Livestock, LLC." Plaintiffs seek injunctive relief with respect to Brian Jones Farms and Nathanial & Riggs Livestock, LLC to the extent Defendant Jones is "holding Plaintiffs' fraudulently obtained investments through either of these alleged business entities." (Doc. 2 at 8; *see also* Doc. 8 at ¶ 3 (noting that Plaintiffs "invested $525,000 with Mr. Jones and his purported business entities.'"))

[5] Since Plaintiffs have filed a verified compliant, their allegations have the same force and effect as an affidavit for the purposes of a motion. *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).

Defendant Jones informed Mrs. Abrahamson that he was offering an investment opportunity as part of a business plan involving the transfer of male calves in Wisconsin to Texas for slaughter ("Texas Investment").  (*Id.* at ¶¶ 9–13).  Defendant Jones represented that he had discovered a market inefficiency in the cattle industry and that he expected to realize a $38,000 profit per week of cattle transfers.  (*Id.* at ¶¶ 12–14).  As a part of the Texas Investment Defendant Jones presented to Mrs. Abrahamson, and later to Dr. Abrahamson, Defendant Jones guaranteed that for each $25,000 "investment unit" purchased, an investor would receive returns of $1,000 per week for fifty-two weeks.  (*Id.* at ¶¶ 15, 18).  Based on these representations, between October 2015 and April 2016, Plaintiffs purchased twenty-one "investment units" in the Texas Investment.  (*See id.* at ¶¶ 16–30).[6]

At the end of February 2016, Defendant Jones approached Dr. Abrahamson about investing in a separate deal in which male calves would be sold to a large rancher in Missouri ("Missouri Deal").  (Doc. 1 at ¶ 25).  Defendant Jones explained that the Missouri rancher had committed to purchasing a minimum of 2,000 calves per week for at least one year and Defendant Jones would realize a gross profit of $60,000 for the weekly sale of 2,000 calves.  (*Id.* at ¶¶ 26–27). Defendant Jones sought $100,000 to help fund the Missouri Deal, which Plaintiffs agreed to provide.  (*Id.* at ¶¶ 29–30).  In ex-

---

[6] On December 29, 2015, Plaintiffs made an "emergency loan" to Defendant Jones in the amount of $100,000 to allegedly buy out a "disgruntled investor".  (*Id.* at ¶ 20).  As a result of Plaintiffs' investment, Defendant Jones promised that Plaintiffs could elect to (1) be repaid the amount of the loan; or (2) leave the "emergency loan" invested with Defendant Jones for four additional "investment units" plus a "bonus" unit.  (*Id.* at ¶¶ 20–21).  Plaintiffs opted to keep their "emergency loan" invested with Defendant Jones.  (*Id.* at ¶¶ 21–22).  With the "bonus unit," Plaintiffs were entitled to the proceeds from twenty-two "investment units."

change, Plaintiffs were promised 50% of the weekly profits on the Missouri deal for eight weeks. (*Id.* at ¶ 29).[7]

On November 11, 2015, Plaintiffs had begun receiving weekly payments of $2,000 from Defendant Jones, and Plaintiffs' weekly payment amounts increased as Plaintiffs purchased additional "investment units." (Doc. 1 at ¶ 22).[8] In total, Plaintiffs received $170,000 from Defendant Jones as purported returns on their investment. (Doc. 8 at ¶ 3). However, in March 2016, Defendant Jones stopped making the required payments on the investments. (*Id.* at ¶ 37).[9] Defendant Jones offered numerous excuses and explanations for these missed payments. (*Id.* at ¶ 42).[10]

On April 10, 2016, Dr. Abrahamson loaned Defendant Jones $16,198 for emergency repairs to Defendant Jones's home HVAC. (Doc. 1 at ¶ 41). On April 29, 2016, Defendant Jones promised to repay Dr. Abrahamson $220,000, plus $16,198 for

---

[7] After the eight-week period, Plaintiffs "rolled over" their investment and purchased four additional "investment units" (included in the twenty-one "investment units" purchased). (*Id.* at ¶ 30). At the time of the "roll over," Defendant Jones promised Plaintiffs weekly payments of $22,000 for twelve months. (Doc. 1 at ¶ 30).

[8] Specifically, from January 2016 through March 8, 2016, Defendant Jones made payments of $18,000 per week. (*Id.* at ¶ 24).

[9] Plaintiffs believe the weekly payments were intended to instill false confidence with respect to Defendant Jones's willingness and ability to deliver the promised returns. Plaintiffs now believe that Defendant Jones never had the intention to pay back the entire amount he promised.

[10] Defendant Jones claimed that the payments stopped because Fifth Third Bank ("Fifth Third") filed a number of Suspicious Activity Reports on his account for large cash transactions, and the Suspicious Activity Reports "froze" his bank accounts. (*Id.* at ¶ 38). Defendant Jones provided Dr. Abrahamson with several bank letters that showed he deposited large sums into Fifth Third accounts and that Fifth Third had subsequently closed his accounts. (*Id.* at ¶ 39; Doc. 1-1, Ex. 5). Defendant Jones also tendered checks to Plaintiffs that were rejected for lack of sufficient funds. (Doc. 1 at ¶ 42; Doc. 1-1, Ex. 6).

4

the HVAC loan, by May 2, 2016. (*Id.* at ¶ 43). Defendant Jones claimed that he had a cashier's check for over $1,500,000 from US Bank that he was going to deposit into Bath State Bank in Indiana, so that he could issue payment to Plaintiffs. (*Id.*) Within a few days, Defendant Jones claimed that he deposited the US Bank cashier's check (as well as another deposit of over $200,000) with Fifth Third Bank instead, because his attorney had resolved Suspicious Activity Reports that had frozen his Fifth Third account(s). (*Id.* at ¶ 44). Defendant Jones provided Plaintiffs with copies of purported deposit receipts to prove that he had deposited the money with Fifth Third. (*Id.*) When Plaintiffs contacted Fifth Third to see if the deposit slips matched its records, Fifth Third confirmed that the deposit slips were fraudulent. (*Id.* at ¶ 45).[11]

Throughout May and June 2016, Defendant Jones agreed on multiple occasions to pay Plaintiffs approximately $95,000 by a specific deadline. (Doc. 1 at ¶ 47). Defendant Jones has further agreed, both orally and through text messages, that if the $95,000 payment were not delivered by the agreed-upon deadline, he would refund Plaintiffs' entire investment, in excess of $500,000. (*Id.*) The deadline has been extended several times after Defendant Jones claimed he could not deliver the money as promised. (*Id.*) Despite his repeated promises to do so, Defendant Jones has not made the $95,000 payment to Plaintiffs or refunded Plaintiffs' investment. (*Id.*)

At various times, Defendant Jones executed promissory notes with Plaintiffs.

---

[11] At the 7/15/16 Evidentiary Hearing, Timothy Spurlock, a Special Investigator with the Corporate Investigations Team at Fifth Third Bank testified that he was asked to undertake an investigation with respect to these deposit slips. Based on this investigation, he concluded that the deposit slips were not generated by Fifth Third and, instead, were forgeries.

5

(Doc. 1 at ¶ 31). The first promissory note was executed on December 10, 2015, and states that $225,000 is to be repaid one year from the date of execution. (*Id.* at ¶ 32; Doc. 1-1, Ex. 1). The second promissory note was executed on January 29, 2016, and states that $125,000 is to be repaid one year from the date of execution. (Doc. 1 at ¶ 33; Doc. 1-1, Ex. 2). The third promissory note was executed on February 4, 2016, and states that $100,000 is due to be repaid in full by May 2, 2016. (Doc. 1 at ¶ 34; Doc. 1-1, Ex. 3). The fourth promissory note was executed on February 26, 2016 and called for Defendant Jones to make eight consecutive weekly payments of $30,000 beginning on February 29, 2016 and one balloon payment of $100,000 on April 22, 2016. (Doc. 1 at ¶ 35). Defendant Jones failed to make the required payments on the third and fourth promissory notes, and is now in default on those notes. (*Id.* at ¶¶ 34, 35).[12]

In their Complaint, Plaintiffs bring claims against Defendants for violations of federal and state securities laws, common law fraud, negligent misrepresentation, conversion, and unjust enrichment. (Doc. 1 at 9–17). Plaintiffs seek preliminary and permanent injunctive relief,[13] compensatory damages, punitive damages, attorney's fees, and costs. (*Id.* at 16–17).

At this time, Plaintiffs seek the following injunctive relief:

---

[12] Plaintiffs believe Defendant Jones executed the promissory notes to convince Plaintiffs that his fraudulent scheme was legitimate and to "paper the investment." Plaintiffs allege that Defendant Jones never intended to honor the terms the promissory notes. (*Id.* at ¶ 36).

[13] Specifically, Plaintiffs seek a preliminary and permanent injunction that would "(1) freeze all assets under Defendants' control, management, and/or possession, (2) require Defendants to provide Plaintiffs with an accounting of all assets under their control, management, and/or possession, and (3) refund any portion of Plaintiffs' investment in Defendants' control, management, and/or possession." (*Id.* at 16–17).

1. The freezing of all assets under Defendants' control, management, and/or possession, not to exceed the total sum of Plaintiffs' investment funds less any amounts returned by or recouped from Defendants.

2. The requiring of Defendants to provide an accounting of all assets under their control, management, and/or possession.

3. The enjoining of Defendants from using, converting, or disposing of Plaintiffs' assets in their possession, custody, and control including, but not limited to, the total sum of Plaintiffs' investment funds less any amounts returned by or recouped from Defendants.

4. An order requiring Defendants to deposit with the Clerk the total sum of Plaintiffs' investment funds, not to exceed the total sum of Plaintiffs' investment funds less any amounts returned or recouped from Defendants.

5. Any other further relief as deemed appropriate by the Court.

(Doc. 6 at 2). In total, Plaintiffs invested $525,000 with Defendant Jones and his purported business entities. Therefore, their total out-of-pocket loss is $335,000, plus any applicable interest. (Doc. 8 at ¶ 3).[14]

## II.   STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *Reid v. Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996)). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the

---

[14] This loss represents the $525,000 investment, less the $170,000 purported returns on the investment. (*Id.*)

7

purpose of a temporary restraining order is to maintain the status quo." *Id.* (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).[15]

An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id.* at 573.

These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). Nonetheless, a finding that there is no likelihood of success on the merits is usually fatal. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir.2000),

---

[15] "A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from the specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the Court in writing the efforts, if any, which have been made to give the notice and the reason supporting the claim that notice should not be required." Fed. R. Civ. P. 65(b). "Reasonable notice" consists of information received within a reasonable time to permit an opportunity to be heard. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439, (1974). In light of the efforts made by Plaintiffs to notify Defendants of the hearing, the Court finds that there was sufficient oral and written notice. *See* Note 2, *supra.*

### III. ANALYSIS[16]

#### A. Likelihood of Success on the Merits[17]

In Ohio, the elements of an unjust enrichment claim are as follows: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *L & H Leasing Co. v. Dutton*, 82 Ohio App.3d 528, 612 N.E.2d 787, 791 (1992) (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 465 N.E.2d 1298 (1984)). Unjust enrichment arises out of a contract implied in law. *Hummel v. Hummel,* 133 Ohio St. 520, 14 N.E.2d 923, 925–26 (1938). A "contract implied in law" is not a true contract, but is a "quasi-contract" implied by a court when a party "retains money or benefits which in justice and equity belong to another." *Id.* at 926–27.

Ohio law does not allow parties to "seek damages under quasi-contractual theories of recovery" such as a claim of unjust enrichment when a contract governs the relationship. *Davis & Tatera, Inc. v. Gray–Syracuse, Inc.*, 796 F.Supp. 1078, 1085 (S.D. Ohio 1992). Recovery under an unjust enrichment theory is precluded because the terms

---

[16] The Court finds that it has specific personal jurisdiction over Defendants as they had sufficient contacts with the state of Ohio through their solicitation of Plaintiffs to satisfy due process requirements. Further, the terms of Ohio's long-arm statute are met as Defendants transacted business in Ohio or are alleged to have caused tortious injury in Ohio. *See* OHIO REV. CODE § 2307.382(A)(1), (3).

[17] In their brief in support of their motion, Plaintiffs primarily argue that they are able to demonstrate a likelihood of success on the merits with respect to their claimed violations of the Securities Exchange Act (and Rule 10b-5 promulgated thereunder). However, because Plaintiffs must demonstrate an entitlement to equitable relief to prevail on their request for injunctive relief, *see* Section III.B, *supra*, and Plaintiffs argue that their entitlement to equitable relief arises from their unjust enrichment claim, the Court will assess their likelihood of success on the merits with respect to that claim.

9

of the agreement define the parties' relationship.  *Wolfer Ent., Inc. v. Overbrook Dev. Corp.*, 132 Ohio App.3d 353, 724 N.E.2d 1251, 1253 (1999).  However, a claim for unjust enrichment may be pled in the alternative when the existence of an express contract is in dispute and <u>may be maintained despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality</u>.  *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F.Supp.2d 763, 772 (N.D. Ohio 2004).

As an initial matter, Plaintiffs' Verified Complaint sufficiently demonstrates that Plaintiffs conferred benefits on Defendants (*i.e.* investment funds) and that Defendants knew of these benefits (in fact, Defendants had solicited them).  Plaintiffs have also carried their burden to prove a likelihood that Defendants' retention of the investment funds would be unjust without payment because there of the evidence of fraud, bad faith, and illegality.

As demonstrated in Plaintiffs' Verified Complaint, Defendant Jones consistently misled Plaintiffs as to the nature and status of his business ventures, leading Plaintiffs to invest, repeatedly, what was, in all likelihood, a Ponzi scheme.  Defendant Jones failed to meet the obligations owed to Plaintiffs under the terms of their investment agreements, both oral and written, including promissory notes signed on February 4, 2016 and February 26, 2016, by not providing guaranteed investment returns to Plaintiffs. (Doc. 1 at ¶¶ 34–35).  In order to justify his failure to provide Plaintiffs with returns, Defendant Jones provided Plaintiffs with one story after another, including claims that large bank deposits that he made had been flagged and withheld by Fifth Third Bank.  (*Id.* at ¶ 38). Finally, when Plaintiffs challenged Defendant Jones, he doctored bank documents in an

10

effort to assuage Plaintiffs' concerns. (*Id.* at ¶ 45).[18] For all of these reasons, this factor weighs in favor of injunctive relief.

### B. Irreparable Harm

"To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet v. Lexington-Fayette Urban County Gov't.*, 305 F.3d 566, 578 (6th Cir. 2002).

The loss of the ability to collect a money judgment is not typically regarded as irreparable harm under Rule 65. The United States Supreme Court underscored this point in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999), in which it held that a district court has "no authority to issue a preliminary injunction preventing [the defendants] from disposing of their assets pending adjudication of [the plaintiffs'] contract claim for money damages." The plaintiff in *Grupo Mexicano* sought a preliminary injunction to prevent the defendant from transferring its rights in certain bonds to other parties on the grounds that defendant was: (1) at a high risk of insolvency; (2) in the process of dissipating its assets to other creditors; and (3) taking actions with its assets that would "frustrate any judgment" plaintiff could obtain. *Id.* at 312. Despite these risks—and the district court's determination that plaintiff was "almost certain" to succeed on the merits of its claim—the Supreme Court reversed the preliminary injunction, explaining that "a general creditor (one without a judgment) had

---

[18] As set forth above, this fact is also supported by the testimony of Timothy Spurlock.

11

no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property." *Id.* at 319–20.

However, the Supreme Court distinguished cases in which a plaintiff seeks *equitable relief*. *See Grupo Mexicano*, 527 U.S. at 324–25. This "exception" was applied in *Concheck v. Barcroft*, No. 2:10-cv-656, 2010 WL 4117480 (S.D. Ohio Oct. 18, 2010), a case which Plaintiffs contend is analogous to the instant case. In *Concheck*, the plaintiff asserted various claims (including breach of contract, breach of fiduciary duty, fraud, and unjust enrichment) stemming from his investment relationship with the defendants. *Id.* at * 1. After an adversarial hearing, the *Concheck* court granted the plaintiff's motion for injunctive relief and ordered that the defendants deposit $500,000 into an interest bearing account with the clerk of the court. *Id.* at *3. The *Concheck* court concluded that the plaintiff's claim for unjust enrichment "sound[ed] in equity," and, therefore, injunctive relief did not run afoul of the Supreme Court's decision in *Grupo Mexicano*. *Id.* at *2–3.

Here, Plaintiffs have similarly pled an unjust enrichment claim, which is grounded in equity. Plaintiffs also request the "return" of their investment, which constitutes equitable relief.[19] Plaintiffs have provided evidence that their investments, less the

---

[19] Restitution is the remedy provided upon proof of unjust enrichment "to prevent one from retaining property to which he is not justly entitled." *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.,* 166 Ohio St. 254, 256, 141 N.E.2d 465 (1957). Restitution can be either a legal or an equitable remedy. *Santos*, 101 Ohio St.3d 74, 2004–Ohio–28, 801 N.E.2d 441, at ¶ 11. An equitable restitution claim was one in which "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

12

amount already returned in the form of purported returns, totaled $355,000.

The *Concheck* court found that the Plaintiff was "likely to suffer irreparable harm if [the defendants] are not required to submit funds from Plaintiffs initial investment they still retain to the safekeeping of the Court" where evidence "indicat[es] that [the defendants] are willing to dispose of or conceal remaining funds rather than return them" and the funds at issue are "likely contracted by fraud").[20] Here, Plaintiffs have made repeated demands to Defendant Jones for the return of their investment funds, only to be rebuffed. (Doc. 1 at ¶ 47). While Defendant Jones, on several occasions, assured Plaintiffs that he would return to them some or all of their invested funds by certain dates, he failed to meet those obligations. (*Id.*) Plaintiffs argue that Defendant Jones' recent behavior—including the forging of bank deposit slips—indicates that Defendant Jones realizes that his schemes are failing and puts Plaintiffs' assets at risk.

However, in this context, Plaintiffs must articulate "a clear and close nexus to the assets sought to be enjoined." *Trustees of Sheet Metal Workers' Local Union No. 80 Pension Trust Fund v. Winchester Land, L.L.C.*, 722 F.Supp. 2d 826, 828 (E.D. Mich.

---

[20] The Sixth Circuit has recognized that the Court has the authority to enter a preliminary injunction freezing assets where there is evidence of fraudulent conveyances meant to evade collection on a judgment. *Williamson v. Recovery Ltd. Partnerships*, 731 F.3d 608, 628 (6th Cir. 2013). A fraudulent conveyance is "a transfer of an interest in property for little or no consideration, made for the purpose of hindering or delaying a creditor by putting the property beyond the creditor's reach." *He v. Rom*, No. 1:15-CV-1869, 2015 WL 8488998, at *2 (N.D. Ohio Dec. 11, 2015) (citing *Black's Law Dictionary* (10th ed. 2014)). While Plaintiffs have offered evidence of *fraud* with respect to their substantive claims, they have not presented evidence of *fraudulent conveyances* needed to acquire a preliminary injunction under this exception. Should they uncover such evidence, the Court would anticipate a motion to amend the complaint, and a motion for a preliminary injunction based thereon. *See, e.g.*, *Jieyi Elecs. Co. v. Case Indus., Inc.*, No. 5:14-CV-01996, 2015 WL 2238899, at *2 (N.D. Ohio May 12, 2015).

2010) (quoting *In re Qwest Communications Int'l, Inc. Sec. Litig.*, 243 F.Supp.2d 1179, 1183–84 (D.Colo. 2003)) ("The plaintiff's equitable claim must have a 'sufficient nexus to the assets sought to be enjoined, before a court may issue a prejudgment injunction freezing or limiting a defendant's use of his assets.'").[21] In light of this principle, the Court believes it is premature to freeze Defendants' assets in an amount equal to Plaintiffs' loss or to order that assets in that amount be deposited with the Court. Instead, a prohibition on the use, conversion, and disposition of Plaintiffs' assets, and an order that Defendants provide an accounting of their assets, will maintain the status quo, while seeking to protecting Plaintiffs from irreparable harm to their assets and enabling Plaintiffs to pursue evidence prior to the hearing on their motion for a preliminary injunction.

### C. Substantial Harm to Others or the Public

The Court finds that limited injunctive relief would not prevent or impede Defendants from operating any legitimate business endeavors with which they may be involved. Defendants will not suffer a loss of revenue as a result of the Court's prohibition on their use of Plaintiffs' assets in their possession.

---

[21] *See also Dixon v. Smith*, 119 Ohio App. 3d 308, 319, 695 N.E.2d 284, 291 (1997) ("[O]nce unjust enrichment is established, the burden is on the claimant to trace the funds to an identifiable product. *State ex rel. Marietta v. Groves* (Aug. 9, 1985), Washington App. No 84 X 7, unreported, 1985 WL 8297. A constructive trust is not a right to recover on a debt owing; it creates a right to recover property wrongfully held. *Staley v. Kreinbihl* (1949), 152 Ohio St. 315, 40 O.O. 361, 89 N.E.2d 593. Therefore, a trust will follow property through all changes in its state and form so long as the property, its product, or its proceeds are capable of identification. 91 Ohio Jurisprudence 3d (1989), Trusts, Section 270. Because identification is crucial to permit recovery of the wrongfully held property, tracing is fundamental to a constructive trust.")

Further, it is in the public interest to enjoin Defendants from using, disposing of, or distributing Plaintiffs' assets. After all, the temporary restraining order "may deter others from orchestrating fraudulent investment schemes." *Concheck*, 2010 WL 4117480 at *3. Additionally, Defendants will be prevented from using Plaintiffs' assets to give purported returns to unsuspecting investors.

For the foregoing reasons, the factors, on balance, weigh in favor of limited injunctive relief.

## IV.     CONCLUSION

Accordingly, Plaintiffs' motion for temporary restraining order (Doc. 2) and supplemental motion for temporary restraining order (Doc. 6) are **GRANTED IN PART.** Specifically, the Court orders as follows:

1. Defendant Brian D. Jones SHALL NOT individually, nor through Defendants Brian Jones Farms or Nathanial & Riggs Livestock, LLC, use, convert, or dispose of Plaintiffs' assets in their possession, custody, and control including Plaintiffs' investment funds (in an amount up to $335,000); and

2. On or before July 2, 2016, Defendant Brian D. Jones SHALL provide to Plaintiffs an accounting of all assets under his control, management, and/or possession, including any such assets held in the name of Defendants Brian Jones Farms or Nathanial & Riggs Livestock, LLC.

3. Forthwith, Plaintiffs SHALL provide Defendants with a copy of this Order via e-mail. Additionally, the Clerk shall mail copies of this Order to Defendants at the addresses listed in the certificate of service to Plaintiffs' motion for a temporary restraining order (Doc. 2).

This Temporary Restraining Order shall expire fourteen (14) days from the entry of this Order. The Court determines that Plaintiffs need not post a bond currently.[22]

Accordingly, **this civil action is set for a status conference by telephone on July 25, 2016 at 2:00 p.m.**, at which time the Court will address the necessity of a hearing on Plaintiffs' motions for preliminary injunction (Docs. 2, 6). COUNSEL SHALL CALL: 1-888-684-8852; Access Code 8411435; Security Code 123456; and wait for the Court to join the conference.

**IT IS SO ORDERED**.

Date: 7/15/16

*s/ Timothy S. Black*
Timothy S. Black
United States District Judge

---

[22] *See* Fed. R. Civ. P. 65(c): " (The court may issue a … temporary restraining order only if the movant gives security in an amount the court considers proper …." (emphasis supplied). "The rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)).